FILED

2016 Mar-21  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **BARRY KEITH WOODARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:14-CV-01650-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On April 7, 2011, the claimant, Barry Woodard, applied for supplemental security income under Title XVI of the Social Security Act. (R. 199-205). The claimant initially alleged disability beginning March 15, 2007, because of status post fracture of the left clavicle; degenerative disc disease of the lumbar spine; osteoarthritis of the left hip; obesity; chronic and severe pain; erectile dysfunction; "shoulder problems"; "vision problems"; depressive disorder; generalized anxiety disorder; social phobia, and post traumatic stress disorder (hereinafter "PTSD"). (R. 13, 35, 209).

The claimant later amended the onset date of his alleged disability to April 7, 2011. (R. 12). The Social Security Administration denied his claims on June 30, 2011. (R. 119-124). On July 1, 2011, the claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 126-128). The ALJ held a primary hearing on June 8, 2012, and a supplemental hearing on January 13, 2013. (R. 12).

1

In a decision dated February 8, 2013, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for SSI. (R. 25). On June 25, 2014, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-6). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether substantial evidence in the record fails to support the ALJ's RFC assessment that the claimant had no limitations in dealing appropriately with supervisors, coworkers, and usual work situations.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm factual determinations that substantial evidence supports. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity (hereinafter "RFC"), and the application of vocational factors, "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and qualifies for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence that the ALJ relies on. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

3

can be expected to last for a continuous period of not less than 12 months...". 42 U.S.C.

§423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520,

416.920.

The ALJ reviews medical and other evidence to determine the claimant's RFC to do work

despite his impairment. 20 C.F.R. §§ 404.1520(e) and 416.920(e); *see also Lewis v. Callahan*,

125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ's assessment of the claimant's RFC must be

based on all relevant medical and other evidence in the record. *See* 20 C.F.R. § 404.1545(a).

Once the ALJ finds that a claimant cannot return to prior work, the burden of proof shifts

to the Commissioner to show other work the claimant can perform. *Gibson v. Heckler*, 762 F.2d

1516 (11th Cir. 1985). The Commissioner must establish that the claimant, who could not

perform past relevant work, could perform other work in the national economy. *Foote v. Chater*,

67 F.3d 1553, 1559 (11th Cir. 1995). "The preferred method of demonstrating that the claimant

can perform specific work is through the testimony of a vocational expert." *MacGregor v.*

*Bowen,* 786 F.2d 1050, 1054 (11th Cir. 1986).

4

## V. FACTS

The claimant was forty-eight years old when the ALJ issued the administrative decision. (R. 34). He has a GED, and his past work experience includes employment as a construction worker, a sales clerk, a mason, a foundry worker, and a factory machine operator. (R. 220-27). The claimant alleged disability because of status post fracture of the left clavicle; degenerative disc disease of the lumbar spine; osteoarthritis of the left hip; obesity; chronic and severe pain; erectile dysfunction; "shoulder problems"; "vision problems"; depressive disorder; generalized anxiety disorder; social phobia; and PTSD. (R. 13, 35, 209). Although the claimant listed erectile dysfunction, shoulder problems, and vision problems in his disability report, he did not allege, nor does any evidence in the record suggest, any work-related limitations arising from these alleged impairments.

In his undated Adult Function Report, the claimant reported that back pain and depression prevented him from working and from sleeping well. He stated that he was able to cook simple meals, but not as much as he had "when [he] was better." He also stated that he went grocery shopping two or three times a week, attended church, and did light housework, but only shopped or did housework for periods of twenty minutes or less because of his back pain. He claimed that his alleged impairments affected his ability to lift, squat, bend, stand, walk, sit, climb stairs, and complete tasks. However, the claimant also reported ability to follow written and spoken instructions "as well as anyone," and stated that he got along with authority figures "very well." (R. 228-36).

### *Physical Limitations*

In his disability report dated April 14, 2011, the claimant alleged disability beginning on

5

March 15, 2007, but later amended the alleged onset date to April 7, 2011. The record contains

no evidence concerning physical limitations before the original alleged onset date. (R. 199, 207).

On April 5, 2007, the claimant began seeing orthopaedic specialist Dr. Karl Hoffmann

after breaking his left clavicle. The injury did not heal as expected, which Dr. Hoffmann

attributed to the claimant's frequent smoking. Additionally, the claimant re-broke his left

collarbone during the healing process by coughing. The claimant saw Dr. Hoffmann for six

months, the last visit occurring on October 8, 2007. On this visit, Dr. Hoffmann told the claimant

that, if he felt no symptoms, he needed no further treatment. The claimant did not return to Dr.

Hoffmann. (R. 251-272).

On May 19, 2010, the claimant visited Dr. Charles Ogles, a family doctor at Ashland

Family Care, complaining of low back pain allegedly beginning approximately on May 11, 2005.

The claimant described his pain level as ten on a scale of one to ten; he claimed that walking and

riding in a car worsened his pain and that lying down alleviated his pain. Dr. Ogles completed a

physical examination of the claimant, revealing only tenderness and muscle spasms. He

prescribed Mobic, Lortab, Flexeril, and Glucosamine Chondrotin, and instructed the claimant to

follow up with him in one month. (R. 274-78).

The claimant returned to Ashland Family Care to follow up with Dr. Ogles on June 10,

2010. Notes from this visit reveal the same neck and low back pain, muscle tenderness, and

muscle spasms as in the prior visit. According to Dr. Ogles, X-ray results from this visit showed

degenerative disc disease. Dr. Ogles continued the claimant's prescriptions for Flexeril, Lortab,

and Mobic, and instructed the claimant to find a treating doctor in the claimant's county of

residence. (R. 279-82).

6

On July 22, 2010, the claimant visited the Citizens Baptist Medical Center Emergency Room complaining of neck and back pain. Dr. Joseph Walker took an X-ray of the claimant's lumbar spine, which revealed no significant bone or joint abnormality. Dr. Walker's notes indicated only that "there may [have been] very mild narrowing at the L5-S1 disc space with some minimal spurring at the end plates at L5 and the superior end plate of L4 with perhaps minimal facet hypertrophy." (R. 286-292).

On May 31, 2011, following the claimant's application for SSI benefits, the claimant visited Dr. Anthony Fava for a medical examination at the request of the Social Security Administration. The claimant reported chronic low back pain, claiming that he could not sit or stand for more than twenty minutes because of this pain. Dr. Fava's notes also state that the claimant complained of chronic left hip pain resulting from an injury he suffered in 2003. After conducting a physical examination, Dr. Fava noted that the claimant was morbidly obese, carried a cane, and was unable to squat and arise, but also that the claimant walked normally without use of a devise, did not experience muscle tightness or stiffness, and could get on and off the examination table without difficulty. The claimant's major muscle groups had full strength; the claimant had full range of motion in his neck and back; the examination revealed no neck spasms; and the straight leg raise test returned negative. (R. 293-98).

Dr. Fava diagnosed the claimant with degenerative disc disease and osteoarthritis of the left hip. He opined that the claimant was able to perform the following work-related activities: sitting, standing, and walking for less than twenty minutes; lifting, carrying, and handling objects weighing less than three pounds; and hearing and speaking. (R. 293-96).

On June 15, 2011, the claimant visited Dr. Michael Vaughn at MedHelp complaining of

neck, back, and hip pain. Dr. Vaughn completed a physical examination of the claimant and reported the following problems: decreased range of motion in the neck with extension, side flexion and rotation; decreased range of motion in the back; pain with motion in the back; and lower back pain with squatting. However, the examination also revealed a normal gait, full muscle strength, and a negative result in the straight leg raise test. Dr. Vaughn prescribed Lortab, Flexeril, and Mobic. (R. 331-34).

The claimant returned to Dr. Vaughn on July 5, 2011, again complaining of hip pain, neck pain, and lower back pain. The claimant showed Dr. Vaughn X-rays of his neck from Dr. Ogles; Dr. Vaughn reviewed the X-rays and stated that they appeared normal. Dr. Vaughn completed another physical examination, the results of which mirrored the claimant's June 15 examination. Dr. Vaughn discussed the alleged back pain with the claimant at length, explaining that it was, at most, degenerative joint disease. He instructed the claimant to do core muscle strengthening exercises to help the pain. (R. 335-37).

On June 27, 2011, disability consultant Dr. Robert Heilpern completed a Physical Residual Functional Capacity Assessment, based on a review of the medical records, on behalf of the Social Security Administration. He found the following external limitations: the claimant could occasionally lift up to fifty pounds; he could frequently lift up to twenty-five pounds; he could stand and/or walk for a total of six hours in an eight-hour work day with normal breaks; and he could sit for a total of six hours in an eight-hour work day with normal breaks. Dr. Heilpern found no limitations on the claimant's ability to balance, stoop, kneel, crawl, crouch, or climb stairs. He also found no manipulative, visual, communicative, or environmental limitations for the claimant. (R. 305-09).

Dr. Heilpern found that the claimant did have a medically determinable impairment that could reasonably be expected to cause the claimant's alleged limitations and symptoms, but stated that the medical evidence in the record did not support the alleged severity of the claimant's limitations. Because of this finding, he considered the claimant's statements to be only partially credible. Dr. Heilpern noted a medical source statement in the claimant's file that differed significantly from his findings, referring to Dr. Fava's report, but stated that he gave Dr. Fava's opinion little weight because it was inconsistent with the overall medical evidence in the file and with the claimant's own statements. (R. 310-11).

*Mental Limitations*

On October 10, 2005, the claimant visited Cheaha Mental Health Center. Notes from this visit indicate that the claimant reported poor self-esteem and no hope for the future. The treating source, not identified in the note, diagnosed the claimant with depression, assessed his Global Assessment of Functioning (GAF) at 50, and recommended therapy. The record contains no indication that the claimant ever followed up with the recommended therapy, and the claimant did not visit Cheaha Mental Health Center again until May 15, 2007. (R. 358).

On June 14, 2006, the claimant's mother brought him to Brookwood Medical Center Emergency Room because of "increased feelings of depression." Notes from this visit indicate that the claimant reported feeling like he wished he was dead, but that he lacked suicidal ideation. He reported having a history of depression and stated that he was seeing a counselor in Sylacauga, but did not give the counselor's name. (R. 110-11).

Dr. Armand Schachter treated the claimant while he was at Brookwood. He noted that the claimant had a history of mental illness and multiple psychiatric admissions. Dr. Schachter

9

completed a mental status examination of the claimant and reported poor eye contact and psychomotor retardation, but also reported that the claimant possessed a logical and coherent thought process; a normal mood; an appropriate and stable affect; and good insight, judgment, and cognition. Dr. Schachter diagnosed the claimant with alcohol withdrawal and alcohol dependance and assessed his GAF at 90. He admitted the claimant to alcohol detoxification and noted that he wanted the claimant to "get labs." (R. 106-09).

The claimant remained at Brookwood for two nights until his discharge on June 16, 2006. Upon discharge, Dr. Schachter gave the claimant another mental status exam, revealing good eye contact; no psychomotor retardation; good insight, judgment, and cognition; a logical and coherent thought process; a normal mood; and an appropriate and stable affect. Dr. Schachter diagnosed the claimant with alcohol withdrawal, in remission, and alcohol dependence. He again assessed the claimant's GAF at 90. He instructed the claimant to follow up with AA and a local mental health center; he did not prescribe the claimant any medications upon discharge. (R. 105).

On May 15, 2007, the claimant visited Cheaha Mental Health for the first time since his October 10, 2005 visit. During his May 2007 visit, the claimant reported symptoms of depression and alcohol dependence, and notes from this visit indicate that the claimant had a history of dependence on others and of non-compliance with recommended treatment. Therapist Joe Callahan treated the claimant, noting his depressive disorder and psychological and alcohol dependence. Callahan formed a treatment plan to help the claimant control his depression symptoms and recommended periodic supportive or cognitive therapy sessions; the record contains no indication that the claimant followed up with the recommended therapy. The claimant did not return to Cheaha Mental Health Center until July 23, 2012. (R. 338-344).

On May 19, 2007, and June 10, 2010, the claimant visited Dr. Ogles as discussed above. Dr. Ogles's notes from both visits state that the claimant denied anxiety, thoughts of suicide, depression, or mental problems. Additionally, the psychological portion of Dr. Ogles's examinations of the claimant revealed alertness and cooperation; a normal mood and affect; and a normal attention span and concentration. (R. 273-85).

As noted in the "Physical Impairments" section, the claimant visited the Citizens Baptist Medical Center Emergency Room on July 22, 2010. Notes from this visit reveal that the claimant was not experiencing depression or anxiety at that time and that his mood and affect were normal. (R. 288).

Notes from the claimant's June 15, 2011 and July 5, 2011 visits with Dr. Vaughn indicate that the claimant reported symptoms of anxiety and depression. However, the notes following Dr. Vaughn's examination revealed no psychiatric abnormalities: the claimant had an appropriate affect, normal thought and perception, and normal psychomotor function. (R. 331-37).

On June 22, 2011, the claimant underwent a psychological evaluation from Dr. Storjohann at the request of the Social Security Administration. During this visit, the claimant alleged symptoms of depression, anxiety, depressed mood, nightmares, restless sleep patterns, decreased appetite, social withdrawal, loss of pleasure, infrequent crying spells, low self-esteem, and feelings of hopelessness. The claimant also reported nervousness, racing thoughts, constant worry, and occasional problems with attention and concentration. During this evaluation, the claimant stated that he had not taken psychotropic medication since 2006 and admitted to a history of alcohol and marijuana abuse, noting that he had quit abusing both substances approximately two years before the evaluation. (R. 300-04).

11

Despite the claimant's allegations of serious symptoms, Dr. Storjohann noted that the claimant drove himself to the evaluation and arrived on time, well-dressed, and groomed. The claimant was oriented to person, place, situation, and time, and he was able to perform simple mathematical calculations. His recent and remote memory were intact, and his thoughts were logical, coherent, and goal-directed, without confusion. The claimant's judgment and insight were intact, and Dr. Storjohann noted that the claimant would be able to make acceptable work decisions and manage his own financial affairs. Dr. Storjohann estimated that the claimant's level of intelligence fell in the average range. The only abnormal result in the mental status examination was the claimant's "severely depressed, anxious, and tense" mood. (R. 300-04).

After evaluating the claimant, Dr. Storjohann diagnosed him with major depressive disorder, recurrent, severe, chronic, without psychotic features; chronic PTSD; generalized anxiety disorder; and alcohol and marijuana abuse, sustained full remission. He assessed the claimant's GAF at 48. Dr. Storjohann reported that the claimant appeared to have the following limitations: mild to moderate limitations in his ability to understand, carry out, and remember instructions in a work setting; and marked limitations in his ability to respond appropriately to supervisiors, coworkers, and work pressures in a work setting. (R. 300-04).

On June 28, 2011, state agency medical consultant Dr. Robert Estock reviewed the medical evidence of record and completed a Psychiatric Review Technique. Dr. Estock opined that the claimant had major depression, recurrent, severe, without psychotic features; and generalized anxiety disorder, chronic. Based on these findings, Dr. Estock stated that the claimant had the following functional limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining

concentration, persistence, or pace. (R. 313-26).

Dr. Estock completed a Mental Residual Functional Capacity Assessment on June 28, 2011. He found that the claimant had the following limitations: moderate limitation in his ability to understand and remember detailed instructions; moderate limitation in his ability to carry out detailed instructions; moderate limitation in his ability to work in coordination with or proximity to others without being distracted by them; moderate limitation in his ability to interact appropriately with the general public; moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors; moderate limitation in his ability to respond appropriately to changes in the work setting; and marked limitation in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 327-28).

After completing the assessment, Dr. Estock noted that the claimant would be able to remember and maintain attention to simple tasks and instructions; maintain attention to carry out and complete simple tasks over an eight-hour work day with customary breaks; handle infrequent non-intensive contact with the public and coworkers; accept supportive non-confrontational supervision; and handle infrequent and gradually introduced changes in the workplace. (R. 329).

The claimant visited Cheaha Mental Health Center again on July 23, 2012, and August 14, 2012. Notes from the first visit reveal a diagnosis of major depressive disorder, mild, recurrent, and state that the claimant had a history of depression with symptoms that included feelings of helplessness and hopelessness. The notes also indicate that the claimant's concentration was poor and that his motivation was poor at times. Notes from the second visit are largely illegible, but appear to indicate that the claimant reported being depressed and tired throughout the day. (R. 355-56).

13

*The Original ALJ Hearing: June 8, 2012*

After the Commissioner denied the claimant's request for SSI benefits, the claimant

requested and received a hearing before an ALJ on June 8, 2012. (R. 12). The ALJ first asked the

claimant about his history of alcohol and substance abuse. The claimant testified that in the past

he had abused alcohol heavily to self-medicate for his depression but had stopped both his

alcohol and marijuana abuse eight months prior to the hearing. (R. 61-66).

Next, the claimant described his alleged neck pain, stating that he sometimes had

difficulty turning his head and sometimes could feel his neck grind. He explained that he tried to

keep his head from turning and had to turn his entire body when looking to the left or the right.

He claimed that this neck pain prevented him from sleeping comfortably and that he typically

woke up with pain in his neck. (R. 66-67).

Next, the claimant stated that, because of his alleged hip pain, he was unable to walk up

more than two flights of stairs without needing to sit down. Additionally, he testified that he had

difficulty walking, stating that he typically could not make it through an entire shopping trip

without having to sit down, and that sometimes he could not walk from his house to his mailbox

and back without stopping because of his hip pain. He explained that his hip would lock up and

he would have to lean on something and swing his hip back and forth to loosen it, enabling him

to walk again. He stated that he also experienced hip pain when standing for more than twenty

minutes and had to wait anywhere from thirty minutes to overnight until he could comfortably

stand on his hip again. (R. 67-70).

The claimant then testified that he experienced pain in his lower back when he sat for

longer than thirty minutes. He explained that his back pain limited his ability to lift things,

causing him pain in his left arm when he lifted a gallon of milk, for example. Using a scale of one to ten, the claimant stated that, on a typical day, his pain ranged from a three, when he kept his movement to a minimum, to an eight, when he did housework or stood too long. The claimant also stated that he spent "the majority" of the time between 8:00 a.m. and 5:00 p.m. lying down. (R. 67-70, 74).

The claimant indicated that his mother bought him groceries and that he limited his cooking to simple things, such as microwave dinners.[1] The claimant stated that housecleaning, such as sweeping, caused him pain and that had people come to his house to help with the cleaning. The claimant also testified that he had not had income since 2006. He explained that his mother supported him and stated that she received food stamps for him. (R. 75-76).

Testifying about his depression, the claimant stated that, because of his depression, he could not sleep at night; he had difficulty going out doors; he could not look people in the eye; he feared meeting new people; and he felt inferior. He also stated that he had some problems with his memory and that, because of childhood abuse, sometimes he would freeze up when asked questions. The claimant testified that he hardly spent time with anyone, seeing only his mother and one of his mother's friends on a regular basis. He explained that he previously had seen his fiancé weekly and had lived with her for two months before they broke up, but did not see her anymore at the time of the hearing. The claimant stated that his former fiancé had broken up with him allegedly because of his inability to function normally, but he told the ALJ that he was trying to rekindle the relationship. (R. 70-75).

---

[1] This testimony is inconsistent with the claimant's statements on his Adult Function Report, on which he reported that he did the shopping for his household. (R. 230).

The ALJ examined the vocational expert, James Hare, who first testified to the skill level and exertional level of three jobs that the claimant had previously held: a sales clerk, a foundry worker, and a construction worker. According to Hare, these jobs were semi-skilled and required light, medium, or heavy exertion levels, respectively. (R. 78).

The ALJ then requested that the claimant undergo a psychological evaluation (he did not explain specifically why he wanted the claimant to undergo this additional evaluation) and return for a supplemental hearing after the evaluation. (R. 78-80).

*Dr. Randolph's Psychological Evaluation: August 15, 2012*

On August 15, 2012, the claimant underwent a psychiatric evaluation with Dr. Christopher Randolph at the request of the ALJ. The claimant told Dr. Randolph that he had experienced anxiety and depression for many years; he also stated that he felt very anxious in social settings and avoided people. The claimant reported difficulties with his memory that did not affect his daily functioning. Dr. Randolph noted that the claimant had prescriptions for Vistaril and Remeron, but had not been taking them because of lack of finances. (R. 350-51).

He reported that the claimant displayed a dysphoric and anxious mood during the mental status examination, but that the claimant's orientation was intact and his memory was fair. Dr. Randolph noted that the claimant's thought content lacked harmful ideation or psychosis, and that the claimant possessed fair insight and judgment. (R. 350-51).

Dr. Randolph noted no evidence of impairment in reality testing of the claimant but diagnosed him with major depression, recurrent; PTSD; social phobia; and avoidant personality disorder. He assessed the claimant's GAF at 45 and opined that the claimant was disabled from gainful employment because of his symptoms of PTSD and social avoidance. (R. 350-52).

16

On August 24, 2012, Dr. Randolph completed a Medical Source Statement of Ability to Do Work-Related Activities form upon request of the Social Security Administration. On this form, Dr. Randolph indicated that the claimant would be moderately limited in his ability to understand, remember, and carry out simple instructions, and moderately limited in his ability to make judgments on simple work-related decisions.  Dr. Randolph stated that the claimant would be extremely limited in the following areas: his ability to understand, remember, and carry out complex instructions; his ability to make judgments on complex work decisions; his ability to interact appropriately with the public, supervisors, and coworkers; and his ability to respond appropriately to usual work situations and changes in a routine work setting. (R. 346-49)

*The Supplemental ALJ Hearing: January 11, 2013*

On January 11, 2013, the ALJ held a supplemental hearing. The claimant first testified that he lived with his mother, had no income, and received support from his mother's income and his mother's food stamps. (R. 35).

The claimant then testified that he always felt intimidated and had problems getting along with other people, stating that, in the past, he had occasionally felt intimidated at work and would leave his job because of this feeling. The claimant also stated that he experienced mental anguish and lack of self worth. The claimant explained that he had a hard time speaking up for himself and allowed others to walk over him. The claimant also indicated that he had difficulty focusing on one thing at a time, because his mind went in a lot of different directions. He stated that he sometimes experienced crying spells; sought treatment at Cheaha Mental Health Center for his depression; and experienced PTSD symptoms that allegedly arose from childhood physical and emotional abuse from his father. (R. 37-42, 52).

17

Next, the ALJ examined the vocational expert, Norma Strickland. The vocational expert stated that the claimant had worked as a machine shop production worker during 2004 and/or 2005.[2] She explained that this job was semi-skilled and required a medium level of exertion. The ALJ asked the claimant why he stopped working at this job, and the claimant stated that the company laid him off. (R. 44-45).

The ALJ then proposed a hypothetical to Ms. Strickland, asking her if someone of the claimant's age (forty-eight) with his educational level (GED) could hold any of the claimant's previously held jobs, if that person was limited to simple work; could understand simple instructions; and could make simple work-related decisions. Ms. Strickland testified that such a person would not be able to perform any of the claimant's previously held jobs. (R. 54-55).

The ALJ then asked Ms. Strickland if any jobs existed in significant number in the national economy that such a hypothetical person could perform. Ms. Strickland testified that a person with the claimant's education, past work experience, and limitations could work as an industrial cleaner, with approximately 13,000 jobs in Alabama and over one million in the national economy; a laundry attendant, with approximately 500 jobs in Alabama and 27,000 in the national economy; or a hand packager, with approximately 2,000 jobs in Alabama and 160,000 in the national economy. Each of these jobs are unskilled and require a medium exertional level. (R. 54-56).

Next, the claimant's attorney asked Ms. Strickland if someone of the claimant's age, education, and work background, who had marked to extreme limitations in his ability to respond

---

[2] The transcript is unclear about when the claimant held this job, but indicates that the claimant held it at some point during 2004 or 2005.

appropriately to supervision, coworkers, work pressures, and routine changes in a work setting, would be able to work at all. Ms. Strickland testified that such a person would be unable to work, primarily because of the difficulty the person would have dealing with others. (R. 56-57).

*The ALJ's Decision*

On February 8, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 25). First, he found that the claimant had not engaged in substantial gainful activity since April 7, 2011, the date of his application. (R. 13).

Next, the ALJ found that the claimant had the following severe impairments: depressive disorder and generalized anxiety disorder. He found that these impairments constituted more than a slight abnormality and could reasonably have been expected to have caused more than a minimal effect on the claimant's ability to perform basic work related activities for a continuous period of twelve months or more. (R. 12-13).

The ALJ then discussed the claimant's non-severe alleged impairments. The ALJ noted that the claimant alleged, or the medical record indicated a history of, the following conditions: status post fracture of the left clavicle, degenerative disc disease, osteoarthritis of the left hip, and obesity. However, the ALJ stated that the claimant did not allege, and the medical records did not show, that these conditions caused any substantial limitations. The ALJ then reviewed the medical evidence showing that these impairments were non-severe. (R. 13).

The ALJ first noted that the claimant chose not to have surgery for his broken collarbone, indicating that it was not causing him any serious issues. Turning to the alleged neck, hip, and back pain, the ALJ noted that Dr. Ogles's physical examination revealed only tenderness and muscle spasms, and that Dr. Walker and Dr. Vaughn reported that X-rays of the claimant's neck

19

and spine appeared normal. The ALJ briefly discussed the claimant's obesity, but stated that the claimant did not allege having any limitations from his obesity. (R. 13-14).

The ALJ stated that because the claimant had not alleged ongoing or continuous restrictions based on these physical conditions and was not being treated for any of the conditions at the time of the decision, these conditions constituted, at most, a slight abnormality and could not be reasonably expected to produce more than minimal work-related limitations. Therefore, the ALJ considered these alleged impairments to be non-severe. (R. 15).

The ALJ then discussed the claimant's alleged PTSD, social phobia, and avoidant personality disorder. The ALJ noted that the record did not support finding that these conditions caused more than minimal work-related limitations and that the claimant had not alleged any substantial limitations based on these impairments. He explained that because these impairments caused no more than a mild functional limitation, they did not satisfy the "paragraph B" criteria and, therefore, were non-severe. (R. 15).

To support this conclusion, the ALJ reviewed the medical evidence. He noted that the diagnosis of PTSD came from Dr. Storjohann's and Dr. Randolph's one-time evaluations, and the diagnosis of social phobia and avoidant personality disorder came from Dr. Randolph's one-time evaluation. The ALJ pointed out that treatment records from Cheaha Mental Health Center contained no diagnosis of these conditions, and he noted that the claimant had successfully engaged in substantial gainful activity despite his alleged symptoms from these alleged impairments. The ALJ concluded that the treament notes from Cheaha Mental Health Center, which did not show treatment for PTSD, social phobia, or avoidant personality disorder, outweighed the findings from Dr. Randolph's and Dr. Storjohann's one-time evaluations. The

ALJ stated that none of these alleged mental impairments caused more than minimal functional limitations, and he found that these conditions were non-severe. (R. 15-16).

The ALJ then discussed the severe mental impairments of generalized anxiety disorder and depression, considering whether these impairments satisfied the "paragraph B" criteria. He concluded that the claimant had only mild restriction in activities of daily living; moderate difficulties in social functioning; and mild difficulties with concentration, persistence, or pace. Because the claimant did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ found that the claimant's generalize anxiety disorder and depression did not satisfy the "paragraph B" criteria. (R. 16-17).

The ALJ also found that these impairments did not satisfy the "paragraph C" criteria, because the claimant had no repeated episodes of decompensation; had not been diagnosed with a residual disease process that caused decompensation; had no history of requiring a supportive living environment; and had not displayed an inability to function outside the home. (R. 16).

The ALJ next stated that he found that the claimant had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: the claimant must be limited to simple work; the claimant can only understand, remember, and carry out simple instructions; and the claimant can only make judgements on simple work-related decisions. The ALJ found that the claimant was able to deal appropriately with supervisors, coworkers, and usual work situations. (R. 17).

The ALJ then discussed the weight given to the medical experts' findings and opinions. First discussing Dr. Fava, the ALJ pointed out that although Dr. Fava's examination resulted in normal findings, including the claimant's full muscle strength and his ability to walk normally

without a cane and get on and off the examination table without difficulty, Dr. Fava opined that the claimant could only sit, stand, or walk for periods of twenty minutes and that he could only lift, carry, or handle objects weighing less than three pounds. The ALJ found Dr. Fava's opinion regarding the claimant's functional limitations to be "very inconsistent" with Dr. Fava's own normal findings. He also found Dr. Fava's opinion to be inconsistent with the medical evidence in the record, such as Dr. Vaughn's and Dr. Walker's statements that X-rays of the claimant's neck (Dr. Vaughn) and lumbar spine (Dr. Walker) were normal. Because the medical evidence in the record and Dr. Fava's own findings did not support Dr. Fava's opinion, the ALJ explained that he gave Dr. Fava's opinion very little weight. (R. 14).

Concerning Dr. Storjohann, the ALJ pointed out that, despite normal examination findings, Dr. Storjohann opined that the claimant was markedly limited in his ability to respond appropriately to supervision, coworkers, and work pressures in a work setting. Finding no basis for such a limitation in the medical evidence or in Dr. Storjohann's own findings, the ALJ gave little weight to Dr. Storjohann's opinion regarding these alleged marked limitations. However, the ALJ gave more weight to Dr. Storjohann's normal examination findings, because the medical evidence supported those findings. (R. 19-22).

Next, the ALJ stated that he gave great weight to Dr. Randolph's conclusion that the claimant would only be moderately impaired in his ability to make judgments on simple work-related decisions and in his ability to understand, remember, and carry out simple instructions, because the medical evidence in the record supported this opinion. However, the ALJ explained that he gave very little weight to Dr. Randolph's opinion that the claimant would be extremely limited in his ability to understand, remember, and carry out complex instructions; interact

22

appropriately with supervisors, coworkers, and the public; and respond appropriately to usual work settings and changes in a routine work setting. The ALJ noted that the claimant's daily activities and his treatment records from Cheaha Mental Health Center did not support these extreme limitations. The ALJ also explained that he gave no weight to Dr. Randolph's opinion that the claimant was disabled from gainful employment, because that opinion is reserved for the Commissioner. (R. 22-23).

Turning to Dr. Estock, the ALJ stated that he accorded great weight to Dr. Estock's opinion, because the medical record supported it and no treating medical source contradicted it. Finally, the ALJ stated that he gave substantial weight to the findings of Drs. Vaughn, Hoffman, and Ogles, whose records as treating physicians were useful in determining the full scope of the claimant's impairments. (R. 23).

The ALJ also explained that he found the that claimant's testimony about the intensity, persistence, or functionally limiting effects of symptoms was not entirely credible because the medical evidence in the record did not support it. The ALJ explained this conclusion by comparing the claimant's subjective allegations regarding the severity of his impairments with the objective medical evidence and the claimant's daily activities. Although the claimant alleged a long list of impairments to various doctors and in his disability and function reports, as noted in the above sections, the ALJ pointed out that the objective findings did not support the severity of these allegations. (R. 18-22).

For example, the ALJ pointed out that the records from the claimant's treating physicians at Cheaha Mental Health Center, which spanned a period of seven years, failed to show any diagnoses or treatment for PTSD, social phobia, or avoidant personality disorder. Further, he

pointed out that although the claimant alleged the complete inability to be around other people, that he attended church and went grocery shopping on a regular basis. Furthermore, the ALJ noted that while the claimant alleged limitations in concentration and attention, he was able to drive, pay his own bills, and handle his own finances, which all require a great degree of attention and concentration. (R. 21).

Additionally, the ALJ noted that the claimant told Dr. Storjohann that he got along well with his mother, spent time with his then fiancée, prepared simple meals, did light housework, read, and talked on the telephone. Finally, the ALJ noted that Dr. Storjohann found no deficits in the claimant's memory, attention, or concentration, and that Dr. Estock found no more than a moderate limitation in any area of functioning.[3] The ALJ concluded that all of this evidence did not support the claimant's statements regarding the severity of his symptoms and accordingly found the claimant's statements not fully credible. (R. 21-22).

The ALJ next found that the claimant was unable to perform any past relevant work because the claimant's past relevant work was semi-skilled and his RFC limited him to simple unskilled work. However, based on the vocational expert's testimony, the ALJ found that jobs existed in significant numbers in the national economy that the claimant could perform, such as an industrial cleaner, a laundry attendant, and a hand packager. As such, the ALJ found that the claimant was not disabled as defined in the Social Security Act. (R. 23-24).

---

[3] Dr. Estock found a marked limitation in the claimant's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but here the ALJ appears to be referring to Dr. Estock's "paragraph B" rating of functional limitations, in which Dr. Estock assessed the claimant with no more than a moderate limitation in any area. (R. 323, 328).

## VI. DISCUSSION

The claimant contends that the Commissioner improperly discounted the medical opinions of Drs. Fava, Randolph, Storjohann, and Estock, substituting his own opinion for that of the medical experts. Pl.'s Br. 13. The Commissioner argues that substantial evidence supports the ALJ's decision and his evaluation of the medical opinions of all doctors. This court finds that, even assuming *arguendo* that substantial evidence supports the ALJ's evaluation of the opinions of Drs. Fava, Randolph, Storjohann, and Estock, substantial evidence does not support the part of the ALJ's RFC assessment of the claimant that the claimant would be able to deal appropriately with supervisors, coworkers, and usual work situations with no limitations.

The ALJ reviews medical and other evidence to determine the claimant's RFC, and the RFC must be based on all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e); 404.1545(a); 416.920(e). Once the ALJ finds that a claimant cannot return to prior work, the Commissioner must prove that jobs exist in the national economy that the claimant can perform. *See Foote*, 67 F.3d at 1559; *Gibson*, 762 F.2d at 1516.

Here, substantial evidence does not support the ALJ's assessment of the claimant's RFC regarding the claimant's ability to respond appropriately to supervision, coworkers, and work situations. Each of the consultative physicians–Dr. Estock, Dr. Storjohann, and Dr. Randolph–opined that the claimant had at least a moderate limitation in his ability to respond appropriately to supervision, coworkers, and work situations in a work setting. Dr. Storjohann stated that the claimant would have a marked difficulty in this area, and Dr. Randolph stated that the claimant would have an extreme limitation in this area. (R. 300-04, 346-49).

Dr. Estock stated that the claimant would have moderate difficulties responding

25

appropriately to criticism from supervisors, maintaining socially appropriate behavior, and responding to changes appropriately in a work setting. He also opined that the claimant would have a *marked* limitation in his ability to get along with coworkers without exhibiting behavioral extremes. Significantly, the ALJ gave Dr. Estock's entire opinion *great weight*. (R. 23, 327-28).

Despite the concurring opinions of all three doctors regarding such limitations, the ALJ found that the claimant could deal appropriately with supervisors, coworkers, and usual work situations. (R. 17). Even if the ALJ properly discounted Dr. Storjohann's and Dr. Randolph's opinions that the claimant had marked or extreme limitations in this area, substantial evidence does not support the ALJ's RFC assessment that the claimant has *no* limitations in this area, because Dr. Estock, to whom the ALJ gave great weight, assessed the claimant with moderate or marked limitations in this area. (R. 327-38).

The ALJ must base his RFC assessment of the claimant on all relevant medical evidence in the record, *see* 20 C.F.R. § 404.1545(a), and the medical evidence in this case does not support the ALJ's apparent decision to disregard all opinions regarding the claimant's limitations in his ability to respond appropriately to supervisors, coworkers, and work situations, including an opinion to which the ALJ stated that he gave great weight.  The ALJ erred in finding that the claimant has *no* limitations in this area. Rather, the fact that all of the medical source opinions that assessed the claimant's mental limitations stated that the claimant had at least a moderate limitation in his ability to respond appropriately to supervision, coworkers, and work situations suggests that the claimant has at least *some* limitation in this area.

Furthermore, because substantial evidence does not support the ALJ's RFC assessment of the claimant, the ALJ's finding that jobs exist in significant numbers in the national economy

that the claimant can perform is invalid, because that finding was made considering the ALJ's unsupported RFC assessment. The Commissioner found that the claimant could not perform past relevant work because of his limitations, so the Commissioner has the burden to prove that the claimant can perform other work in the national economy considering his RFC assessment and limitations. *See Foote*, 67 F.3d at 1559.

During the ALJ hearings, the vocational expert testified about the working ability of a person with no limitations in his ability to respond appropriately to supervision, coworkers, and work situations, and of a person with extreme limitations in that area. (R. 54-57). The ALJ did not determine whether jobs existed in the national economy that someone of the claimant's age, education level, and past work experience who had mild or moderate limitations in his ability to respond appropriately to supervision, coworkers, and work situations could perform. Because the relevant evidence suggests that the claimant has at least some limitation in this area, the ALJ must determine whether jobs exist in the national economy that someone of the claimant's age, education, and past work experience, with at least moderate limitations in his ability to respond appropriately to supervision, coworkers, and work situations, can perform.

The court advises the ALJ to reassess the claimant's RFC regarding the claimant's ability to respond appropriately to supervision, coworkers, and work situations, and then, using the new RFC assessment, to determine whether jobs exist in the national economy that the claimant can perform.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the Commissioner's RFC assessment of the claimant regarding his ability to respond

appropriately to supervisors, coworkers, and work situations and is due to be REVERSED and REMANDED. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 21st day of March, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE